**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

| | | |
|---|---|---|
| Dalton M., | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | Case No. 3:21-cv-50452 |
| v. | ) | |
| | ) | Magistrate Judge Lisa A. Jensen |
| Kilolo Kijakazi, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| *Defendant.* | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Dalton M. brings this action under 42 U.S.C. § 405(g) seeking reversal or a remand of the decision denying his applications for child disability benefits and supplemental security income.[1] For the reasons set forth below, the Commissioner's decision is reversed, and the case is remanded.

### I. Background

On March 29, 2019, Plaintiff filed applications for child disability benefits and supplemental security income, alleging a disability beginning on October 31, 2018, because of obsessive-compulsive disorder, bipolar disorder, anxiety, emotional disability, attention deficit hyperactivity disorder, depression, and thyroid issues.[2] R. 18, 74–75, 115–16. At the time he filed the applications, Plaintiff was 18 years old and about to graduate high school.[3] R. 74, 492.

---

[1] The parties have consented to the jurisdiction of a United States Magistrate Judge for all proceedings pursuant to 28 U.S.C. § 636(c). Dkt. 11.

[2] The parties focus their arguments solely on Plaintiff's psychiatric impairments, so the Court will likewise disregard Plaintiff's thyroid issues.

[3] The parties do not dispute that Plaintiff satisfies the age requirement for child disability benefits. 42 U.S.C. § 402(d)(1); 20 C.F.R. § 404.350(a)(5). Apart from the age requirement, the analysis for child disability benefits and supplemental security income is identical. *See* 20 C.F.R. §§ 404.1520(a)(2), 416.920(a)(2).

A remote hearing on Plaintiff's applications was held before an administrative law judge (ALJ) on December 23, 2020. R. 18. The ALJ heard testimony from Plaintiff, an impartial medical expert, and an impartial vocational expert. R. 18. The ALJ issued a written decision on January 29, 2021, finding that Plaintiff was not disabled under the applicable sections of the Social Security Act and thus not entitled to benefits. R. 32.

At step one of the inquiry, the ALJ found that Plaintiff's temporary, part-time work in a supermarket and as an after-school helper supervising children at the YMCA did not rise to the level of substantial gainful activity. R. 20–21 & n.1. At step two, the ALJ found that Plaintiff had the severe impairments of "major depressive disorder; bipolar II disorder; social phobia; obsessive-compulsive disorder (OCD); and attention deficit hyperactivity disorder (ADHD)." R. 21. At step three, the ALJ found that Plaintiff's impairments did not meet or medically equal a listed impairment. R. 21–23. When evaluating Plaintiff's mental impairments, the ALJ concluded that Plaintiff had a mild limitation in understanding, remembering, or applying information; a moderate limitation in interacting with others; a moderate limitation in maintaining concentration, persistence, or pace; and a moderate limitation in adapting or managing himself. R. 21–22. The ALJ then found that Plaintiff had the residual functional capacity (RFC)

> to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can understand, remember and carry out routine instructions. He is not able to meet fast-paced production line work, but is able to meet end-of-day goals. The claimant is able to tolerate occasional interaction with coworkers, supervisors and the general public and is able to tolerate a routine, predictable work setting.

R. 23. At step four, the ALJ concluded that Plaintiff had no past relevant work. R. 31. Applying Plaintiff's RFC at step five, the ALJ concluded that a significant number of jobs existed in the national economy that Plaintiff could perform, such as laundry worker, kitchen helper, and stores laborer. R. 31–32.

After the Appeals Council denied Plaintiff's request for review on September 15, 2021, R. 1, Plaintiff erroneously filed the instant action in the Western District of Wisconsin. Dkt. 1. On Plaintiff's motion, the case was transferred to this Court for decision. Dkts. 4–9.

## II. Standard of Review

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. *Id.* Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). "An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and [her] conclusions." *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021) (quoting *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015)). The reviewing court may not "reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute [its] judgment for the ALJ's determination so long as substantial evidence supports it." *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021).

## III. Discussion

Plaintiff argues that the Court should remand because (1) the ALJ's evaluation of the medical opinion evidence was inadequate, (2) the ALJ failed to explain how she reached her conclusions in her RFC assessment, and (3) the ALJ's evaluation of Plaintiff's subjective statements was insufficient. As discussed further below, the Court agrees that remand is necessary because the ALJ's consideration of the medical opinion evidence was inadequate.

## A. Consideration of Medical Opinions

For child disability claims filed on or after March 27, 2017, like Plaintiff's, ALJs must consider and articulate their consideration of medical opinions, including opinions from the claimant's medical sources,[4] in accordance with 20 C.F.R. § 416.920c. ALJs may consider multiple medical opinions from a single medical source "together in a single analysis," although ALJs are also free to consider each medical opinion individually. *Id.* § 416.920c(b)(1). ALJs must consider five factors when determining the persuasive weight of a medical source's medical opinions: supportability, consistency, the medical source's relationship with the claimant, the medical source's specialization, and "other factors," such as familiarity with other evidence in the claim and an understanding of Social Security disability policies and evidentiary requirements. *Id.* § 416.920c(c)(1)–(5). Although ALJs must consider all five factors for each medical source, ALJs are only required to "explain how [they] considered the supportability and consistency factors for a medical source's medical opinions" because these "are the most important factors." *Id.* § 416.920c(b)(2). The regulation defines these factors as follows:

> (1) Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.

> (2) Consistency. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

---

[4] The parties do not dispute that Plaintiff's health care providers, a licensed advanced practice nurse and a licensed clinical social worker, are medical sources qualified to provide medical opinions. 20 C.F.R. § 416.902(a)(7) (licensed advanced practice nurse is "acceptable medical source" for claims filed on or after March 27, 2017); *see id.* § 416.902(d) (licensed healthcare worker is "medical source"); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00C2 (noting that "medical sources . . . include health care providers such as . . . licensed clinical social workers").

4

*Id.* § 416.920c(c)(1)–(2). ALJs "may, but are not required to, explain how [they] considered" the remaining three factors. *Id.* § 416.920c(b)(2), (c)(3)–(5).

## B. The Medical Opinions in This Case

Plaintiff began psychiatric treatment in December 2013, although he has attended counseling since the third grade. R. 440–41. In February 2014, Plaintiff was hospitalized for two weeks due to a major depressive episode. R. 440–41. Since then, Plaintiff has seen Keith Anderson, a licensed clinical social worker, for therapy sessions one to four times per week. R. 686. Anderson's treatment notes from 2017 to 2020 form the bulk of the medical record in this case. R. 391–439, 690–94, 698–711, 715–37, 753–57, 761–800, 810–19, 823–34, 838–48. Since August 2017, Plaintiff has also seen Lynn Wheeler, a psychiatric advanced practice nurse, for medication management. R. 747. As of November 2020, Plaintiff was taking nine psychiatric medications. R. 835.[5] Wheeler's treatment notes take up a significant portion of the medical record. R. 440–466, 695–97, 712–14, 738–41, 758–60, 820–22, 835–37.

### 1. Anderson and Wheeler

In advance of the hearing, Plaintiff submitted Psychiatric Reports from Anderson and Wheeler, dated March 2020. R. 686–89, 747–50. Both reports indicated serious limitations with Plaintiff's work-related functioning, particularly noting struggles with authority, arguments with teachers and peers, and angry, impulsive reactions to customary work pressures. R. 688, 749. The ALJ found the Psychiatric Reports unpersuasive and rejected them. R. 29–30.

Plaintiff also submitted a Mental RFC Assessment from Anderson, dated October 2020. R. 803–08. Anderson reiterated his earlier concerns about Plaintiff's work-related functioning, noting that Plaintiff is "[u]nable to meet competitive standards" in his abilities to "accept

---

[5] The medications are Concerta, Abilify, sertraline, Seroquel XR, lithium carbonate, lamotrigine, trazodone, hydroxyzine, and clonazepam. R. 835.

instructions and respond appropriately to criticism from supervisors," "get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes," and "respond appropriately to changes in a routine work setting." R. 805. Anderson supported his findings with lengthy explanations, remarking that Plaintiff had "problems [with] teachers and authority, and supervisors on the job" and major difficulties with conflicts, getting upset, getting his feelings hurt, anger, and outbursts. R. 806. Anderson added that Plaintiff's "current medication regimen[] has helped with mood stability but currently he is not employed, when last employed 15 hours a week – he struggled greatly." R. 808. Anderson concluded that Plaintiff had an extreme limitation in interacting with others and moderate to marked limitations in the remaining areas of mental functioning. R. 807. The ALJ found Anderson's RFC Assessment unpersuasive and rejected it. R. 29. Plaintiff asserts, and the Commissioner does not refute, that an extreme limitation in interacting with others would keep him from sustaining full-time work. Pl.'s Br. at 6, Dkt. 20.

### 2. The Medical Expert

At the hearing, the ALJ heard testimony from impartial medical expert Michael A. Lace, Psy.D. R. 63–67. Dr. Lace testified that Plaintiff's file supported the conditions of bipolar disorder, major depressive disorder, OCD, social phobia, and ADHD. R. 63. Dr. Lace described the mental status examinations[6] conducted by Anderson and Wheeler as follows:

> For July 2020 to November 2020, "all within normal limits with some references to anxiety at presentation." R. 63–64 (citing R. 810–49).

---

[6] "The mental status examination is the psychiatrist's version of the physical examination. . . . It combines information gathered from passive observation during the interview with data acquired through direct questioning to determine the patient's mental status at that moment. . . . [T]he mental status examination can be divided into the broad categories of appearance, behavior, motor activity, speech, mood, affect, thought process, thought content, perceptual disturbances, cognition, insight, and judgment." Rachel M. Voss & Joe M Das, *Mental Status Examination*, National Library of Medicine (Sept. 12, 2022), https://www.ncbi.nlm.nih.gov/books/NBK546682/.

> For March 2020 to July 2020, "some restricted affect, a few that had suggestions of labile mood, meaning some moodiness, as well as anxiety . . . in the context of normal presentation otherwise." R. 64 (citing R. 753–802).
>
> For Anderson's March 2020 opinion, "anxiety and depression noted in the mental status exam." R. 64 (citing 747–50).
>
> For April 2019 to February 2020, "the same with . . . some sadness noted within an otherwise totally normal presentation." R. 64 (citing R. 681–741)
>
> For November 2018 to April 2019, "the same with . . . some symptoms present at the contact that are consistent with . . . the diagnoses." R. 64 (citing R. 431–66).

Dr. Lace went on to testify that "[o]ther references to severity, [in Anderson's RFC Assessment, R. 803–09], are largely marked, which doesn't appear to match what I believe to be the writer's notes, the social worker notes in [R. 810–49], where presentation is generally normal without exception." R. 64.

Dr. Lace opined that Plaintiff had a mild limitation in understanding, remembering, or applying information; a moderate limitation in interacting with others; a moderate limitation in maintaining concentration, persistence, or pace; and a moderate limitation in adapting or managing himself. R. 65. Dr. Lace further opined that Plaintiff's limitations could be accommodated with the RFC restrictions of occasional contact with coworkers, the general public, and supervisors; no fast-paced production line work but able to meet end-of-day goals; and routine tasks with few, if any, changes in the nature of the tasks throughout the day. R. 65–66. The ALJ found Dr. Lace's opinion fully persuasive and adopted his opined limitations and RFC restrictions. R. 21–23, 28.

## C. The ALJ's Consideration of the Medical Opinions

Throughout the ALJ's analysis of the medical opinions, she refers to Plaintiff's 2019–2020 mental status examinations as "normal," "generally normal," or "within normal limits," stating that they reflect "a normal presentation" apart from "some restricted affect [and] a few notes with

labile mood and anxiety." R. 28–30. The ALJ cites these mental status examinations as a basis both for rejecting Anderson's and Wheeler's opinions and for adopting Dr. Lace's opinion. R. 29–30.

Plaintiff argues that the ALJ erred by mischaracterizing the 2019–2020 mental status examinations and thus failed to adequately address the supportability and consistency of Anderson's and Wheeler's opinions under 20 C.F.R. § 416.920c. Pl.'s Br. at 3–4, Dkt. 20. More specifically, Plaintiff cites to a number of abnormal findings in the same mental status examinations and argues that they refute the ALJ's broad-brush characterization of the mental status examinations as "generally normal." *Id.* The Court finds that, without further explanation, it is unclear how these abnormal findings are inconsistent with Anderson's and Wheeler's opinions.

Recall, for example, that Anderson opined that Plaintiff had an extreme limitation in interacting with others that was worse when Plaintiff was working. R. 806–08. Without further explanation, it is not clear to the Court how mental status examinations showing irritable mood, poor or fleeting eye contact, agitated motor activity, and persecutory delusions are inconsistent with an extreme limitation in interacting with others. R. 708, 761, 773, 790, 798, 823 (irritable mood); R. 461, 464 (poor eye contact); R. 835 (fleeting eye contact); R. 438; 708; 723; 729; 798; 833 (agitated motor activity); R. 835 (withdrawn behavior); R. 729, 776 (persecutory delusions). As such, the Court cannot trace the path of the ALJ's reasoning between these abnormal findings and the ALJ's conclusion that the 2019–2020 mental status examinations were "generally normal" and thus inconsistent with Anderson's and Wheeler's opinions. *Butler*, 4 F.4th at 501 (ALJ "must provide a 'logical bridge' between the evidence and [her] conclusions" (quoting *Varga*, 794 F.3d at 813)); *see, e.g.*, *Merriman v. Berryhill*, No. 16 CV 50073, 2017 WL 2345551, at *5 (N.D. Ill.

May 30, 2017) ("[B]y flattening these disparate findings into a univocal conclusion—'essentially normal'—the ALJ downplayed the evidence favorable to plaintiff and did so by conducting a layperson analysis of the underlying findings made by the doctors.").

Moreover, the record contains significant evidence that is potentially consistent with and supportive of Anderson's and Wheeler's opinions. Focusing again on Anderson's opinion that Plaintiff had an extreme limitation in interacting with others, particularly in a work setting, the record reflects the following: In November 2018, Plaintiff "did not feel comfortable" at the supermarket job he had started in August 2018, so he quit. R. 349, 431–32. In December 2018, Plaintiff's teacher did not allow him to have his study guide with him during a test, so he "sabotaged and failed by not trying in protest," and Plaintiff's mother reported that he was "angry and blaming others and not really taking responsibility." R. 434. In March 2019, Plaintiff's mother left a message for Anderson, reporting that Plaintiff "had not been handing in [school]work and [was] also confrontational with authorities and [that] this was a major concern." R. 438. In April 2019, Plaintiff's school behavior intervention plan reported:

> Inappropriate responses to staffs' requests or expectations: [Plaintiff] may walk away from staff, walk out of the room, begin debating/arguing with staff, refuse (verbally telling staff "no"), [i]gnore staff, mumble under his breath, well[] up with tears holding back from crying, not follow classroom expectations as well as not come to class with required materials.

R. 487. This behavior occurred "approximately weekly." R. 487. Another behavior intervention plan reported that this behavior "c[ould] last a few moments or the whole day" and Plaintiff would "continue sharing his concern with staff in the next class due to his inability to move forward." R. 615. The intensity of Plaintiff's behavior was "highly dependent on the response from staff involved . . . . The more staff/peers engage[d] with [Plaintiff], the greater the intensity bec[ame]." R. 615. In June 2019, Plaintiff wrote a suicide note and expressed frustration that others did not

understand him. R. 692. While Plaintiff was staying at his cousin's house in July 2019, he had

"some conflict with his cousin . . . which erupted into his cousin throwing a desk at him. No one

was hurt and they did make up but [Plaintiff] was upset and shook this occurred." R. 700. In August

2019, Plaintiff began working at the YMCA five days a week and immediately reported frustration

with his coworkers, who would yell at the students and get upset with Plaintiff when he tried to

support them. R. 703–04. In September 2019, Plaintiff "seemed to be struggling with work" and

"felt intimidated," reporting that he took it personally and became upset when another staff

member confronted a student. R. 708. In November 2019, Plaintiff was "stressed and anxious

about work and the problems related to the loud noises and tension between h[im] and other staff."

R. 716. In January 2020, Anderson said that Plaintiff was "struggling with increased anxiety and

problems with keeping his job" and wanted to quit. R. 722. Plaintiff's mother called Anderson and

was "extremely upset about [Plaintiff's] behavior and . . . his desire to quit his job at the YMCA."

R. 724. Plaintiff began working just three days a week at the YMCA and started searching for

another job. R. 727. In February 2020, Anderson noted "[i]ncreased sadness and problems related

to work stress [and] ongoing emotional distance as well as anxiety on the job." R. 730. Plaintiff

continued to have conflict with his supervisor, who wrote his mother an email regarding how

uncooperative Plaintiff was with their expectations and disrespectful of [his supervisor's]

authority. R. 736. Anderson noted that Plaintiff was not happy there and felt too much anxiety.

R. 736. According to Anderson, Plaintiff "almost seemed relieved" that his mother had filed his

disability application based on Plaintiff's "inability to hold [a] job and co[pe] with daily anxiety

in a job situation." R. 736. In March 2020, Wheeler noted:

> [Plaintiff's] mother reached out yesterday to report recent mood
> decline which she described as meltdowns. [Plaintiff] reports today
> that past two weeks he has indeed been having problems with
> emotion regulation. States he is not coping well with his new job

> (watching young kids in the afterschool YMCA program). Endorses depressed and anxious mood, irritability, anger reactivity, limited frustration tolerance occurring coincident with the days he has to go to job. States he knows he needs a job "but this was the wrong one", struggling to cope, feels completely overwhelmed by all the kids, every day before work anxiety builds, wants to quit and his mom and brother won't let him, ends up in fights with them and meltdowns every day before work.

R. 741. Anderson noted that Plaintiff "was not sure if he c[ould] continue in this place of employment and/or able to continue to work due to the extreme level of anxiety and fear at times he experience[d] in dealing with anxiety on a daily basis." R. 754. Wheeler noted that the "primary exacerbating factor" of Plaintiff's psychiatric problems was his job. R. 758. After a session with Plaintiff on March 25, 2020, Anderson noted:

> Discussed [Plaintiff's] anxiety in general and continues frustration and fears related to the job that really is and has been so anxiety provoking and does not want to continue to work and probably will not as there is a question if school will resume this year due to the virus pandemic.[7]

R. 762. In April 2020, Plaintiff's supervisor emailed Plaintiff's mother explaining that while Plaintiff was working, he "would pace and become extremely agitated from being so nervous" and had to take breaks ranging from 30 minutes to an entire two-and-a-half-hour shift to get his anxiety under control, going home several times and once "leaving [his supervisor] alone with several children." R. 751.

The above evidence appears to be consistent with and supportive of Anderson's and Wheeler's opinions that Plaintiff had an extreme limitation in interacting with others, but the ALJ does not address it in her analysis of these opinions. On remand, the ALJ may ultimately conclude that this evidence is inconsistent with or not supportive of Anderson's and Wheeler's opinions, but the ALJ must confront this evidence head-on and provide good reasons, supported by substantial

---

[7] Given that Plaintiff has not worked since March 2020, this appears to be what happened. R. 349.

evidence, for her conclusions. Simply characterizing (or mischaracterizing) Anderson's and Wheeler's notes as normal or generally normal, without more, will not satisfy the ALJ's obligation to evaluate the supportability and consistency of Anderson's and Wheeler's opinions in light of the above evidence.

Moreover, the ALJ's reasons for adopting Dr. Lace's opinions suffer from the same lack of analysis. Recall that the ALJ adopted Dr. Lace's opinions because "his findings we[re] consistent with the normal mental status examinations noted between 2019 and 2020." R. 28. As set forth above, this appears to be an oversimplification of the record. Dr. Lace did not address most of the record evidence listed above that details Plaintiff's difficulties in interacting with others, especially in a school or work setting, nor did Dr. Lace address how such difficulties translate into a moderate limitation in interacting with others. Because Plaintiff's ability to interact with supervisors and coworkers is critical to determining his ability to work, more analysis is needed.

To guide the ALJ on remand, the Court also notes that the ALJ's remaining explanations are inadequate, at least with respect to Plaintiff's limitation in interacting with others. *See* R. 28–30. First, the ALJ does not explain how Plaintiff's normal cognitive functioning bears on his ability to interact with others, so the Court can only assume that it does not. Second, the ALJ's single, conclusory statement that an extreme limitation in interacting with others is inconsistent with Plaintiff's activities of daily living provides the Court with no insight into the ALJ's reasoning and thus no basis for sustaining her conclusion. *See Zurawski v. Halter*, 245 F.3d 881, 887–88 (7th Cir. 2001). Even assuming the ALJ could supplement this bare conclusion with her findings at step three, the ALJ's step-three analysis also fails to address Plaintiff's many school and work difficulties described above and instead focuses solely on Plaintiff's relationships with his family,

neighbors, and therapist in familiar settings, as well as a one-time interaction with an emergency room doctor. R. 22. The ALJ thus disregarded the fact that "there are critical differences between keeping up with activities of daily living and holding down a full-time job," as the Seventh Circuit has repeatedly emphasized. *Jarnutowski v. Kijakazi*, 48 F.4th 769, 776 (7th Cir. 2022) (quoting *Reinaas v. Saul*, 953 F.3d 461, 467 (7th Cir. 2020)). Even then, the ALJ's analysis fails to confront the contradictory evidence. For instance, the ALJ says that "[d]espite [Plaintiff's] difficulties, he was able to stay at a cousin's house for several days at a time and get along with his cousin/aunt." R. 22. The ALJ fails to acknowledge, however, that this visit concluded with Plaintiff's cousin "throwing a desk at him," R. 700, and "ha[ving] nothing to do with him" for more than a month, R. 704. Although the ALJ may ultimately find that the contradictory evidence is consistent with her original conclusions, she must draw an accurate and logical bridge between that evidence and her conclusions on remand.

In light of the Court's finding regarding the ALJ's consideration of the medical opinions, the Court need not address Plaintiff's remaining arguments. However, Plaintiff's counsel should raise all issues argued on appeal with the ALJ on remand, both in a pre-hearing brief and at the administrative hearing. Failure to explicitly raise these issues may result in a waiver if this case is again appealed to this Court.

## IV. Conclusion

For the foregoing reasons, Plaintiff's motion for summary judgment is granted, and the Commissioner's motion is denied. The decision of the Commissioner is reversed, and the case is remanded for further proceedings consistent with this opinion.

Date: March 31, 2023                    By:

Lisa A. Jensen
United States Magistrate Judge

14